BINDLEY v. DETROIT RIVER TUNNEL CO. et al.

(District Court, E. D. Michigan, S. D.   August 23, 1918.)

1. PATENTS ⬅170—CLAIMS—CONSTRUCTION.
    A patentee is entitled to protection against changes, etc., involving only mechanical skill; but a patentee late in an art is entitled only to what he shows and claims.

2. PATENTS ⬅328—CONSTRUCTION—INFRINGEMENT.
    The McBean patent, No. 745,454, for a method of constructing a tunnel under water, which combined two of the older methods and contemplated the preparation of a chamber and construction of the tunnel in place therein, held not infringed.

3. PATENTS ⬅328—CONSTRUCTION—INFRINGEMENT.
    The McBean patent, No. 745.456, for a subaqueous working chamber in tunnel construction, held not infringed.

4. PATENTS ⬅328—CONSTRUCTION—INFRINGEMENT.
    The McBean patent, No. 745,457, for a subaqueous tunnel, etc., held not infringed.

5. PATENTS ⬅328—CONSTRUCTION—INFRINGEMENT.
    The McBean patent, No. 797,524, for a subaqueous tunnel, etc., held not infringed.

6. PATENTS ⬅328—CONSTRUCTION—INFRINGEMENT.
    The McBean patent, No. 797,525, for a method of tunnel construction under water, held not infringed.

In Equity.   Suit by Isa McBean Bindley, administratrix of Duncan D. McBean, against the Detroit River Tunnel Company and others. Decree for defendants.

Wade Millis, of Detroit, Mich. (Parker W. Page and Drury W. Cooper, both of New York City, of counsel), for plaintiff.

Henry Russel, of Detroit, Mich. (Robert H. Parkinson, of Chicago, Ill., and Oscar W. Jeffery and Harry G. Kimball, both of New York City, of counsel), for defendants.

TUTTLE, District Judge.   After listening to unusually interesting and able oral arguments for four days, and now at the close of such oral argument, in accordance with my announced custom, I am going to dispose of this case.

[1] The manner of considering the particular art involved in a patent case is not unlike tracing the history of the explorations of a continent.   If we start at a sufficiently early date, it is entirely undeveloped.   Along come the different explorers, making it impossible for those who come after them to re-do what has already been done. Some are looking for gold, some for fountains of youth, some for fur-bearing animals, and some for homes.   These ends desired give the general direction, while the topography of the country, savage natives, and other obstacles to progress are deciding factors in choosing particular mountain passes.   Some, like Columbus, do not know where they have landed.   If they in reality discovered a continent, we give them credit for it, even though they died in ignorance of what they had accomplished.   Others, like Balboa, try to claim, not only what they can see, but make broad and sweeping claims, assuming that

no one else has any rights. Still others, like our Pilgrim Fathers, prefer to settle down on a little patch and carefully fence it around, to indicate just what belongs to them. A discoverer cannot be content to take previous trails. A Roosevelt may find a river in the wilds of South America, and a Peary may discover the particular spot in the ice where the meridian lines intersect, but the time is past for discovering continents. Those who simply walk in the tracks of their predecessors, and see only those landscapes which are plainly visible from those paths, cannot be said to be discoverers. Such pretending discoverers are merely sightseers and students of geography. Such assumed inventors are in fact only mechanics and engineers.

Applying this thought to the subject of patents, the extent that an inventor is presumed to have explored beyond his actual path is the distance that a skilled mechanic or engineer is able to look from such tracks. The extent of the landscape is not to be determined as of the time the predecessor took the trail, but at the time the man who makes his claim for a patent went that way. He cannot receive credit for discovering those things which are so near to the old tracks that an ordinarily skilled mechanic or engineer, standing in those tracks, could have seen them without having them pointed out by the claimant. So in these patent cases we take the undeveloped portion of the art, and determine how much of what was open to discovery has actually been brought to light by the patentee. A patentee is not entitled to all that is left by prior patents, publications, and uses. He receives only that portion of what is left which he shows and claims.

In this manner, having determined the extent and scope of plaintiff's claims, we may proceed either to determine the question of validity or infringement. If both questions are fairly in dispute, I usually consider first the question of infringement. By pursuing that course, the court is less likely to pass upon matters not in issue, and avoids doing unnecessary damage to plaintiff's patent. In this manner we have studied the art of tunneling.

It is conceded that in 1903, when plaintiff's decedent applied for four of the patents here in suit, there was known in the art the old drifting method, by which for many years mountains had been tunneled. Small rivers, in certain kinds of soil, had also been tunneled by this method; but it was poorly adapted for going under the water. The shield method was another method which had been in use for tunneling under rivers, a well-known example of which is the Grand Trunk tunnel at Port Huron; the United States end being in this state and in this district. One difficulty with the shield method was that it was not possible to go near to the water. It had to go too deep, too far down. It made an unnecessary grade. A still greater objection, and one which ought to have made it prohibitive was the necessity for men working in such high air pressure that there was a tremendous loss of life. Both of those methods had to do with getting under the river by starting in from the side and keeping deep down, far below the bed of the river. It was desirable to have the tunnel as near to the surface of the water as the rules of the War Department for the protection of navigation would permit.

There were three possible methods for that sort of construction then in use. One, the caisson method, by which, as in the shield method, the men were compelled to work under a high air pressure. By this method the workmen by means of the device went down from the surface of the water and worked on the bottom of the river. Although there was no bottom to the device, they were able to keep the water from coming in at the bottom by means of compressed air. It was an undesirable method, because of the danger attendant upon the high air pressure. As they got to a great depth, the pressure became so great that it was impossible for the men to live. Then there was another method of doing the work from above, the cofferdam method, which was possible; but you would finally reach a depth great enough so that it was prohibitive, because of the great hydraulic pressure. The water would be forced in through the cofferdam walls, under the wall or through the bottom. By the cofferdam method the bed of the river formed the base, and the walls were usually of sheet piling. Still another method was to construct the tunnel on shore, and float it to a place above the proposed site, and then sink it into position. No one of these three methods had been successfully employed in deep, broad rivers.

Just how far beyond these admitted methods the art went there is some contention here. As I view this lawsuit, and the just disposition of it, it is not necessary for the court to split hairs over the exact extent to which this art had developed beyond these admitted and well-known methods of doing and attempting to do work of that kind. When the court feels very certain about the proper disposition of a case, it is just the time it is liable to be mistaken about it. In this case I have in my own mind no doubt as to the result that ought to be reached. That is not the situation in many patent cases. In the last one I disposed of I said on the record that I reached my conclusion with doubts on my own part; but in this case I feel perfectly satisfied with the conclusion I reach. I feel that further study and thought would not change my views about it. I say that, knowing that those are just the times when a court is likely to be overlooking something.

[2] I will pass over the many intervening steps between those five admitted, well-known methods of the prior art and the patents in suit. There are many patents, like Weisker, O'Rourke, and Thomson, which made serious inroads upon the art. The effect of these prior patents is in dispute. My conclusion is such that the scope and value of these prior patents would not change the result.

The defendant contends that McBean uses only the cofferdam methods, and says it is the cofferdam method with a roof on the cofferdam. The plaintiff assumes that it is a new and different method from any of the others, and calls it building a tunnel in a working chamber. As I view it, McBean is a combination of the caisson method and the cofferdam method.

What McBean did was to drive down the sheet piles until they were in solid, substantial earth, or to bedrock, so that the walls were as nearly impervious to water as he could make them, making these sections as long as he saw fit, and putting in his sheet piling across the

253 F.—48

end, which acted as a bulkhead. And then (I am omitting many steps not here necessary, that are of real importance in the work) he put a roof or cover down under the water across what defendant calls the cofferdam, and in that way made what he calls an air chamber in which he could build a complete tunnel. It was so arranged that he could force air into it, if he was unsuccessful in making the cofferdam structure entirely impervious to water. So far as the sheet piling kept the water from coming in through the sheet piling, under the sheet piling, or up through the bottom, to that extent McBean was using the old cofferdam method; to the extent that it failed in this, resulting in the necessity for forcing in air, he was using the caisson method. He combined the two methods in such a way that he could use both at the same time, and let what had been objectionable in one be overcome by the other. In other words, the compressed air of the caisson method prevented the water from coming in as it had done with the cofferdam method. The resistance to the water from the cofferdam made it unnecessary to use the high air pressure, which was dangerous in the caisson method.

If McBean was entitled to all the credit for taking the steps from the two old separate methods to the new and combined method, I would feel that it was a step displaying such genius and bringing such results that he should be rewarded with a valid patent. Without undertaking now to narrow the art by the patents cited by defendant, I will pass that step and see whether, giving plaintiff the benefit of the serious doubt as to validity, the defendant has infringed.

The McBean patent combines the two well-known methods of the caisson and the cofferdam. For the purpose of this discussion and on the question of infringement I am giving McBean full credit for having made that advance in the art. As already indicated, it is plain that he is not entitled to all that credit.

The so-called first patent in suit is No. 745,454 of December 1, 1903. While there are claims 1, 3, 9, 10, and 11 in suit, it has been agreed on the record by counsel that whatever conclusion I reach as to No. 11 will dispose of this patent, and all of its claims in suit. Claim No. 11 reads as follows:

"11. The method of constructing a tunnel under water, consisting in erecting vertical walls around the site extending to bedrock or below the bottom of the proposed tunnel, then placing a roof thereon to form therewith a chamber, then forcing air into said chamber and expelling the water therefrom, and then constructing the tunnel in place therein."

It is so well agreed on this record just what the defendant has done that I am not going to waste time in attempting to describe it, except as may be necessary in discussing the particular claims.

The big question that has been discussed before me during nine-tenths of the time is whether or not this defendant, when it completed its tunnel and built the structure that went inside of the iron tube was building a tunnel within the working chamber described in this claim No. 11. That is really the meat of this lawsuit, and the thing important to this plaintiff, if he is right in his contention. That should be interpreted in the light of the art, in the light of the McBean drawings,

specifications, and claims. What did he have in mind, and what new and useful thing did he show to the world? He built a complete tunnel in a working chamber. He did everything in the way of making a tunnel in a working chamber, except digging a portion of the trench, driving down some piles, and refilling a portion of the trench. Everything else was done in a working chamber. He dug down to the solid rock and filled in the concrete, just as if it was in the open air, without any interference with the water. He cut off the piles, other than the side piles, to the desired height. He built up his tube in this working chamber, and he put the concrete around the tube inside the working chamber. So he built an entirely completed tunnel in a working chamber.

Now, the defendant, on the other hand, has done nothing in a working chamber, except what was done inside of the iron casing. The question is here whether or not the defendant, by doing the concrete work inside of the iron casing, was building a tunnel in a working chamber, as shown by McBean. Defendant, without any air other than ordinary atmospheric pressure, went into the iron casing and built in the concrete lining, made it strong, made it durable, and finished a tunnel.

That makes it necessary for the court to reach some conclusion as to what is meant, within this patent, by a "tunnel," as well as by a "working chamber." It does not matter much which angle I proceed from, but it seems to me it is well to find out what McBean means by a "tunnel." Now, the problem was to get the tunnel so that it would be impervious to water and would resist the hydraulic pressure. When you had reached that point, so that it might be entered from the land, and anything that was desired could be done in it, without forcing in air, the problem had been solved. The defendant reached that stage in its work before it worked in any working chamber whatever. I find nothing in this patent which prevents defendant from building a tunnel by going down through the water with tremie pipes, pile drivers, and dredges. There is nothing in this patent which prevents defendant from constructing anything it sees fit on the land, and floating it over the place where the tunnel is desired, and then sinking it down in place.

What the defendant has done is to use the old method of working through the water, scooping out a ditch, constructing a tunnel on land, taking it out and sinking it, and by tremie pipes depositing the concrete down through the water under, around, and over the tubes in the bottom of the river, and by these methods finally reaching such a stage in the work that they have a hole under the river, which can be entered from the land. No air pressure is needed on the inside of it; men can enter it, men can work in it, the water is kept out, and when they reach that stage the difficult problem has been solved, and the structure is a tunnel, within the meaning of the patent, and it has been built without any working chamber. It is claimed by the plaintiff that then, from that time on, because defendants lined this tunnel with concrete work three feet thick, which undoubtedly gave it the great strength and durability to be desired in a tunnel, that they built a tunnel in an air chamber under the water.

We must keep in mind the problem that McBean was trying to solve. It is plain that defendant solved it in a way entirely different from McBean. To take the position of the plaintiff in this case would mean that McBean had by this claim No. 11 in this patent in suit obtained such a monopoly over the right of constructing tunnels that no engineer or contractor could construct a subaqueous tunnel by beginning at the outside in his work, no matter what method he used, because just as soon as he kept the water back and resisted the hydraulic pressure sufficiently, so that he could begin from the outside and work inside, and complete his tunnel on the inside, just so soon he was working in a chamber. There is nothing in this patent that warrants any such broad construction or interpretation of it by the court. It seems very clear to me that this patent, called the first patent in suit, has not been infringed.

[3] I turn now to what has been called the second patent in suit, which is No. 745,456, December 1, 1903. It is agreed by counsel that my attention may be directed to claims 2 and 6, and that whatever result I reach as to these two claims ought to be the conclusion I reach as to the others.

Claim 2 reads as follows:

"2. In tunnel construction, a subaqueous working chamber formed by the roof of the tunnel and walls extending downward below the bottom of the structure to be built."

Claim 6 reads as follows:

"6. In tunnel construction, a subaqueous working chamber, comprising impervious side walls, extending downward to bedrock or to a depth below the bottom of the proposed tunnel, and the tunnel roof supported thereon in permanent position."

This is like the so-called first patent, except that it substitutes for what was a wooden roof in the first patent a metallic roof, which is subsequently to become the top of the tube for the tunnel. The conclusion reached as to this patent is the same as that reached as to the first patent, for the reasons mentioned in disposing of the first. Like the first patent, it is held not infringed.

[4] The so-called third patent in suit, No. 745,457, December 1, 1903, is for the actual tunnel inside the working chamber. In his first two patents McBean undertakes to describe the working chamber and the method by which he constructs his subaqueous tunnel, while the third patent, the one last mentioned, describes the tunnel itself. It is agreed by counsel that, while there are three claims in suit, 6, 9, and 10, the conclusion reached with reference to 6 and 10 should be controlling as to 9.

Claim 6 reads:

"6. A subaqueous tunnel, comprising a metallic tube, supporting side walls therefor, a pile foundation and a mass of masonry serving as a bed for said tube, said walls and piles being anchored to said masonry."

Claim 10 reads:

"10. A subaqueous tunnel structure, comprising a mass of masonry, inclosing the tunnel passage, foundation piles imbedded in said masonry, sheeting side

walls anchored to the masonry, and tie rods connecting the sheeting on opposite sides."

Claim 6 claims the very things that were shown in the first patent, and, in addition, the anchorage of the concrete to the sheet piling that formed the sides of the working chamber. McBean went down to bedrock, and this anchorage would, of course, tie the masonry to the sheet piling, and would add to the support from the piling directly under the tunnel the extra support from these sheet pilings at the side. It would also tie the sheet piling to the tunnel proper.

I find nothing of this kind in the defendant's structure. I find no supporting side walls within the meaning of this patent, and no pile foundations within the meaning of this patent. There are no side walls which go down to bedrock. The meaning which I find McBean had for piles in his patent is the meaning which I have always had in mind, a long, tapering timber which goes down into soil that is not substantial enough to be used for a foundation in the ordinary way. These piles are driven down, and then, by reason of the friction between their circumference and the earth, they are substantially solid. I do not find that McBean had in mind such a foundation as the defendant has built here.

There is little, if any, value in these patents, other than the so-called first one. If there was any value to the public in McBean's discovery, it was shown in the first patent. These other patents cover minor matters. I doubt very much their validity, not only because they are a part of what was shown in the first patent, but upon the broad question that they do not approach that degree of skill, genius, and novelty necessary for a valid patent. The first patent stands in a different class. If these other patents have any value at all, they are dealing with things so old that they should be held to the specific things described and the exact combination described. When we come to consider equivalents, or as to any other phase of their construction, they must be interpreted strictly and not given a broad meaning.

Looking more particularly at claim No. 10 I perhaps ought to mention the four posts or piles which defendant used to position the grillage. Plaintiff calls them piles; defendant calls them pegs; but it does not make much difference what name is given them. I am satisfied that the real purpose and function they serve is to fix the grillage as to altitude and level, laterally and longitudinally, in position. That is the real function they serve. It is an important function in that way, but any other thing they do is simply an unimportant incident, and one the court ought not to be influenced by in this lawsuit.

In view of the degree to which the art must be narrowed, and in view of the description given by McBean himself, I am forced to say there is no infringement.

[5] The fourth patent is No. 797,524, August 15, 1905. This is like patent No. 3, just described, except it shows a different method of putting the tunnel together. The only claim I am asked to consider here is claim No. 8. It is agreed by counsel that whatever dis-

position I make of claim No. 8 ought to be the disposition which I make of the other three claims in suit.

Claim 8.reads:

"8. A subaqueous tunnel, comprising a masonry base, inclosing side walls, supporting piles and devices interconnecting said piles and said side walls; said devices and the tops of said piles being imbedded in said masonry."

What I have said in reference to the claims of the third patent applies with equal force to the so-called patent No. 4, and ought to be controlling. There are no inclosing side walls within the definition of the claim. There are no supporting piles within the definition of this claim. Neither are there any devices interconnecting piles to the side walls, within the fair meaning and interpretation of these claims.

[6] Coming now to the last patent in suit, No. 797,525, August 15, 1905, it is agreed by counsel that I should dispose of claims Nos. 1 and 3, and their disposition should control as to 5 and 8.

These claims read:

"1. The method of constructing subaqueous tunnels, which consists in first building a foundation or base, and then progressively erecting the tunnel superstructure thereon within a pneumatic chamber.

"3. The method of constructing subaqueous tunnels, which consists in first preparing a foundation of piles, then imbedding the tops of said piles in masonry to form a tunnel base or foundation, and then progressively erecting the tunnel superstructure thereon."

This so-called fifth patent is more like the first patent, and it rests upon the very same idea covered in the first patent. As I read this claim 1, my first thought, without having in mind the drawing and specifications and what McBean said about it, was that he was claiming that he first built a foundation and then within a working chamber did the rest of the work. Upon more careful thought I am satisfied that he is simply making a broad sweeping "Balboa" claim that will cover everything. I think he intends to cover any tunnel that is built in an air chamber, but what I have said with reference to the first patent disposes of this fully. Defendant did not build a tunnel in a working chamber.

The bill is dismissed, with costs to the defendant, to be taxed.